Joseph A. Sarafite, J.
Defendant moves for leave to serve an amended answer, and plaintiffs cross-move for summary judgment.
Plaintiffs seek recovery of $552,200 damages pursuant to an agreement, allegedly breached by defendant, wherein defendant agreed to purchase from them certain stock of the Lionel Corporation.
Plaintiffs, owners of a manufacturing concern, and Lionel negotiated for the purchase of the firm by Lionel. Lionel was then controlled by the individual defendant. The plaintiffs valued their business at $800,000; they agreed to sell but not without assurance that they would receive $800,000; the defendant then personally gave that assurance in writing; the plaintiffs thereupon delivered their business to Lionel upon that assurance. Of the $800,000, plaintiffs have received only $247,800 leaving a balance of $552,200 unpaid.
The purchase agreement was reduced to writing and a contract was executed on June 29, 1961, between plaintiffs and Lionel. Lionel agreed to give plaintiffs 123,500 shares of Lionel stock for their business. The Lionel shares were unregistered and the agreement therefore incorporated certain restrictions on plaintiffs’ right to sell the stock. However, the proof clearly indicates plaintiffs’ interest was not primarily directed toward a sale of their business for Lionel stock, but rather toward their obtaining $800,000 in cash or in saleable securities worth that amount. Toward that end the aforesaid agreement contained two pertinent provisions. One of the provisions required Lionel to ‘ ‘ include such part” of the Lionel shares delivered thereunder (as plaintiffs might state they wished to have publicly distributed but not to exceed 30,500 shares) to be set forth in the next registration statement filed by Lionel under the Securities Act of 1933 (U. S. Code, tit. 15, § 77a et seq.), which would thus enable their public sale. The registration statement was to be prepared and filed at Lionel’s expense not later than September 15, 1961. The sale of this number of shares at the then market price of $25 to $26 per share would have yielded approximately $800,000 to plaintiffs. The other pertinent provision of the agreement required the plaintiffs to give Lionel the right of first refusal of any proposed sale of Lionel stock to a third party. It was agreed that plaintiffs give written notice of the number of shares to be sold, and that Lionel would have 10 days from the mailing of the notice to elect and purchase the shares.
*1085 Incident to, the above agreement between plaintiffs and Lionel, a second agreement in letter form was simultaneously entered into between plaintiffs and defendant on June 29, 1961. In this agreement, defendant “ In order to induce (plaintiffs) * * * to enter into ” the purchase agreement with Lionel undertook certain obligations which were aimed at assuring to plaintiffs their receipt of the $800,000. The manner of effecting this assurance was defendant’s grant to plaintiffs of a “ put ” of 30,500 shares and such additional shares of Lionel stock at $17.78 a share to make a total of $800,000. This portion of the agreement was divided into two parts. The first [par. 1 (a)], to become operative in the event the above-described registration statement had not been filed by September 15, 1961, or if filed, had not become effective by November 15, 1961, provided that defendant, upon 20 days’ written notice, would himself purchase, or procure the purchase by another, of the 30,500 shares at $17.78 per share. The second part of the agreement [par. 1 (b)] to become operative in the event the stock was registered but plaintiffs were unable to obtain at least $17.78 per share net upon a sale, obligated defendant, upon 20 days’ notice, to either purchase the 30,500 shares at that price or pay plaintiffs the difference between the amount realized by plaintiffs at a public sale of the stock at less than $17.78 per share and the amount that would have been realized at a sale of 30,500 shares at $17.78 per share. Thereunder (par. 2), with respect to the shares that may be “ publicly offered ” by the plaintiffs, defendant was obligated to purchase from plaintiffs, upon 20 days’ notice, “ that number of additional shares ” of Lionel at $17.78 per share which would make up the difference between $800,000 and the total net proceeds to plaintiffs from a sale of the 30,500 Lionel shares. Any notice to defendant under the agreement was required to be given on or prior to January 25, 1962, and if not so given, defendant’s obligation would terminate. Thus, the alleged intendment of the agreement — the receipt by plaintiffs of either $800,000 in cash or saleable securities — is apparent. Lionel’s registration statement, however, was not filed by September 15, and of necessity had not become effective by November 15, 1961, as required by the contract, but instead became effective approximately one year after November 15, 1961. Subsequently the market price of Lionel stock declined, and it is conceded that on January 17, 1962, eight days before the expiration date of January 25, plaintiffs gave defendant notice of their purported exercise of the “put” of $800,000 wherein they requested that defendant purchase 44,995 shares *1086 (30,500 shares plus 14,495 shares) of Lionel stock at $17.78 per share pursuant to paragraphs 1(a) and 2 of the letter agreement. The notice further advised defendant that an offer of 44,000 Lionel shares was then being made to the Lionel Corporation pursuant to the “right of first refusal” clause of the purchase agreement and that if Lionel agreed to purchase these shares, netting the plaintiffs $740,991 at the market price of $16,875 per share, defendant’s obligation would be correspondingly reduced to the purchase of 3,319 shares at $17,78, thus making up the balance of $800,000. Neither Lionel exercised its rights under the agreements, nor did the defendant comply with the “ put.”
The facts up to the date of this notice are essentially undisputed. The interpretation of the parties’ rights and obligations under the instruments referred to is the subject of argument.
Defendant contends (1) that plaintiffs’ notice to defendant on January 17, 1962, was “ materially at variance ” with the terms of the agreement in its demand that defendant purchase more than 30,500 shares; (2) that the plaintiffs’ action subsequent to January 17, 1962, constituted an oral modification of the agreement resulting in either a waiver of their rights, or an accord and satisfaction which gave rise to an estoppel against plaintiffs’ reliance on their rights under the agreement; (3) that the notice given by plaintiffs to defendant did not comply with the agreement because of plaintiffs’ failure to give two 20-day notices which defendant alleges were necessary to give rise to any obligation on his part, absent a public sale by plaintiffs of the stock, instead of the one given. (1) With respect to the first contention, the court is not impressed with defendant’s claim of variance. He asserts that paragraph 1(a) of the letter agreement was never meant to be operative with paragraph 2. This contention is untenable because the very purpose of the agreement with defendant was to assure plaintiffs the sum of $800,000 and thus in effect put a cash floor under the plaintiffs’ transaction with Lionel. Defendant’s argument suggests that plaintiffs agreed to suffer a loss should the stock fail to be registered with no way of recouping the difference to make up the sum of $800,000. It is quite clear, however, that the purpose of the agreement was just to obviate such an occurrence. Defendant’s contention is, therefore, wholly without merit. (2) In support of the claim of oral modification resulting in the waiver, defendant alleges that he advised plaintiffs that he did not desire to purchase the shares; that a meeting was held on February 2, 1962, between the parties and their respective counsel to attempt to resolve the controversy, and that one of the plaintiffs sug *1087 gested to defendant’s attorney “ that a further meeting he held to discuss the options with his regular attorneys (Townley, Updike, Carter & Rogers, Esqs.) ”. This further meeting was never held. It is this failure, primarily, that defendant now claims led him to believe that plaintiffs no longer wished to rely on their “ put ” and “ did not want to sell their stock to (defendant) or anyone else.” Defendant further alleges that at the meeting of February 2, there was a discussion of an attempt to register additional shares of stock. The fact that plaintiffs succeeded in getting Lionel to register these additional shares (90,000) so that they could be sold on the market cannot be deemed, by itself, a waiver of any rights they had under the original agreement for they were under a duty to mitigate damages, and this was one method of doing so. The sham of such defense is further evidenced by the fact that the defendant recognized his liability by (a) abstaining from voting at a Lionel board of directors’ meeting on February 25,1963 (on a proposed resale of plaintiffs’ business to plaintiffs) because he had given 11 certain ‘ puts ’ on him whereby the Steinthals would have the option to sell him certain of their holdings in Lionel,” (minutes of the Lionel board of directors’ meeting. Obviously, such an acknowledgment of existence of the “ put ”, made one year after notice had been given by plaintiffs to defendant, belies defendant’s claim of waiver); and (b) by the defendant’s seeking from plaintiffs a release of his personal liability to them in connection with said resale. When the plaintiffs objected, the proposed release was modified to exclude defendant’s personal liability to plaintiffs, thereby evidencing clearly that such liability existed. This release was given to Lionel on March 1, 1963.
In addition, it is undisputed that the attorneys then representing plaintiffs phoned defendant’s attorney on various occasions subsequent to the February 2 meeting. The purpose of the calls was to ascertain what arrangements defendant had made or was making to perform under the agreement. Moreover, defendant’s attorney does not deny that at meetings with him after the February 2 meeting plaintiffs inquired of forthcoming actions by defendant with respect to performance under the letter agreement. These admitted actions, together with the undenied assertions of further acts of plaintiffs seeking performance by the defendant negative any claim that there was a waiver by plaintiffs. Defendant has asserted no evidentiary matter in support of the defenses. It strains credulity to conclude that in a situation involving close to a million dollars, with detailed agreements drafted and executed by all parties, with all represented by counsel, and with the defendant himself an attorney, that a *1088 modification or accord and satisfaction of defendant’s substantial obligations would not be reduced to writing. Finally, any actions on Lionel’s part, such as registering additional stock, may not constitute the consideration for the discharge of defendant personally, for to do so would, in effect, require a finding of improper action on Lionel’s part, i.e., the use of its funds for t-he benefit of defendant personally (see, generally, Carfi v. De Martino, 181 Misc. 428; Cady v. Bradshaw, 116 N. Y. 188). Plaintiffs’ forbearance from the institution of suit and their attempts to minimize their damages after realizing that defendant would not perform under the letter agreement cannot be used to penalize them and be deemed to constitute a waiver. A more unequivocal act is needed to form the basis for such a defense. (3) With respect to the question of the allegedly defective notice, the letter agreement clearly did not call for more than one notice to be given defendant. Paragraph 3 of the agreement, which sets forth the notice requirements, is couched in the singular. Defendant’s argument on this point would in effect require a rewriting of this paragraph, a different intendment, which could have been, but was not, expressed at the time the agreement was drafted by both parties. It would have been simple to require either two notices in explicit terms, or to require that defendant be given a copy , of the notice plaintiffs sent to Lionel. This was not done.
The measure of damages herein is equally clear. Plaintiffs sold their stock for $247,800. The difference between that amount and $800,000 is $552,200, for which plaintiffs are awarded judgment. Defendant’s motion for leave to serve an amended answer is denied, as moot, in light of the above disposition, although the new matter asserted in the proposed amended answer has been considered in the determination of the summary judgment motion (see Zirman v. Beck, 31 Misc 2d 189).